UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ESTHEFANY CHAPARRO NAVARRO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>Defendants. | Case No. 17-cv-06404-DMR<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 69, 73 |

Plaintiffs Esthefany Chaparro Navarro ("Chaparro Navarro") and Manuel Morales Rodriguez ("Morales") filed this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., and the Mandamus & Venue Act of 1962 ("MVA"), 28 U.S.C. § 1361, seeking to reverse the United States Citizenship and Immigration Services's ("USCIS") revocation of Chaparro Navarro's previously-approved Petition for U Nonimmigrant Status and the agency's consequent denial of derivative U nonimmigrant status to her father, Morales. Plaintiffs now move pursuant to Federal Rule of Civil Procedure 56 for summary judgment to reverse the November 30, 2018 decision by USCIS's Administrative Appeals Office affirming the revocation. [Docket No. 69 (Pls.' Mot.).] Defendants Department of Homeland Security ("DHS"), USCIS, Kevin K. McAleenan, L. Francis Cissna, Laura B. Zuchowski, and Barbara Q. Velarde cross-move for summary judgment to affirm the AAO's decision. [Docket No. 73 (Defs.' Mot.).]

The court held a hearing on December 19, 2019 and ordered the parties to submit supplemental briefing. [Docket No. 78.] The parties timely filed the requested briefing. [Docket Nos. 79-82.] For the following reasons, Plaintiffs' motion is granted in part and denied in part.

## I. STATUTORY FRAMEWORK

In 2000, Congress created the U nonimmigrant status or the "U visa" as part of the Victims

of Trafficking and Violence Protection Act of 2000 (the "Act"). Pub. L. 106-386, § 1513, 114 Stat. 1464 (2000). U nonimmigrant status is a classification for victims of certain crimes who report those crimes to law enforcement and cooperate in their investigation or prosecution.[1] Congress later passed legislation directing the Secretary of Homeland Security and others to promulgate regulations to implement the provisions of the Act. Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. 109-162, 828, 119 Stat. 2960 (2006). DHS's resulting regulations give USCIS sole jurisdiction over all U visa petitions. 8 C.F.R. § 214.14(c)(1).

A petitioner must meet several criteria to be eligible for U nonimmigrant status, including the following: the petitioner must (1) have "suffered substantial physical or mental abuse as a result of having been a victim of" qualifying criminal activity; (2) possess information about the qualifying criminal activity; and (3) be "helpful" or "likely to be helpful" to a federal, state, or

---

[1] The Act sets forth the purpose of the U visa as follows:

> (A) The purpose of this section is to create a new nonimmigrant visa classification that will strengthen the ability of law enforcement agencies to detect, investigate, and prosecute cases of domestic violence, sexual assault, trafficking of aliens, and other crimes described in section 101(a)(15)(U)(iii) of the Immigration and Nationality Act committed against aliens, while offering protection to victims of such offenses in keeping with the humanitarian interests of the United States. This visa will encourage law enforcement officials to better serve immigrant crime victims and to prosecute crimes committed against aliens.

> (B) Creating a new nonimmigrant visa classification will facilitate the reporting of crimes to law enforcement officials by trafficked, exploited, victimized, and abused aliens who are not in lawful immigration status. It also gives law enforcement officials a means to regularize the status of cooperating individuals during investigations or prosecutions. Providing temporary legal status to aliens who have been severely victimized by criminal activity also comports with the humanitarian interests of the United States.

> (C) Finally, this section gives the Attorney General discretion to convert the status of such nonimmigrants to that of permanent residents when doing so is justified on humanitarian grounds, for family unity, or is otherwise in the public interest.

Pub. L. 106-386, § 1513, 114 Stat. 1464.

local law enforcement official or prosecutor, a federal or state judge, the Immigration and Naturalization Service of the Department of Justice, or to other federal, state, or local authorities investigating or prosecuting qualifying criminal activity.  8 U.S.C. § 1101(a)(15)(U)(i).  The statute defines qualifying criminal activity as "that involving one or more of the following or any similar activity in violation of Federal, State, or local criminal law," and lists numerous categories of criminal activity.  8 U.S.C. § 1101(a)(15)(U)(iii).  The corresponding regulation states that "[t]he term 'any similar activity' refers to criminal offenses in which the nature and elements of the offenses are substantially similar to the statutorily enumerated list of criminal activities."  8 C.F.R. § 214.14(a)(9).  Of relevance here, qualifying criminal activity includes "felonious assault."  8 U.S.C. § 1101(a)(15)(U)(iii).  The burden of establishing U nonimmigrant status is on the petitioner.  8 C.F.R. § 214.14(c)(4).

If USCIS approves a petition for U nonimmigrant status, the petitioner receives lawful nonimmigrant status and employment authorization for four years.  8 U.S.C. §§ 1184(p)(3)(B), 1184(p)6).  The petitioner may also apply for U nonimmigrant status for certain qualifying relatives.  Where, as here, the petitioner is under 21 years old, qualifying relatives include the petitioner's parents.  8 U.S.C. § 1101(a)(15)(U)(ii)(I).  After three years of continuous physical presence in the United States, an individual with a U visa may apply to become a lawful permanent resident.  8 U.S.C. § 1255(m)(1).

The regulations provide that USCIS may revoke an approved petition for U nonimmigrant status upon notice to the petitioner for certain enumerated reasons, including where "[a]pproval of the petition was in error."  8 C.F.R. § 214.14(h)(2)(i)(B).  The revocation process requires USCIS to notify the petitioner in writing of its intent to revoke, and the notice must "contain a statement of the grounds for the revocation and the time period for the U nonimmigrant's rebuttal."  8 C.F.R. § 214.14(h)(2)(ii).  If USCIS revokes the petition and terminates the petitioner's U nonimmigrant status, the regulation requires USCIS to provide the petitioner "with a written notice of revocation that explains the specific reasons for the revocation."  *Id.*  The petitioner may appeal a revocation by providing notice to the Administrative Appeals Office ("AAO") within a certain time period.  8 C.F.R. § 214.14(h)(3).  Revocation of an approved petition for U nonimmigrant status terminates

3

that status for the "principal alien," and results "in the denial of any pending [petitions] filed for qualifying family members . . ." 8 C.F.R. § 214.14(h)(4).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Chaparro Navarro and Morales are natives and citizens of Mexico who live in San Francisco. [Docket No. 65 (1st Am. Compl., "FAC") ¶¶ 13, 14.] In February 2010, a man attempted to steal Chaparro Navarro's purse and then forcibly removed necklaces from her neck and fled. Chaparro Navarro was 14 years old at the time. Chaparro Navarro Administrative Record, "CNAR," 156, 317, 345.[2] After Chaparro Navarro identified a suspect, prosecutors charged him with felony child endangerment and felony robbery. The case was eventually settled as a misdemeanor. Chaparro Navarro "was cooperative during the whole process" of investigation and prosecution of the crime. CNAR 156. Following the robbery, Chaparro Navarro became depressed and fearful. She received therapy and was diagnosed with depressive disorder, NOS and post-traumatic stress disorder. CNAR 346, 349.

In December 2011, Chaparro Navarro filed a petition for U nonimmigrant status. CNAR 289-96. USCIS granted her petition on October 1, 2012. CNAR 289, 353. On April 8, 2013, Chaparro Navarro filed a petition for derivative U nonimmigrant status on behalf of her father, Morales. Morales Administrative Record, "MAR," 11-19.

On September 16, 2014, USCIS issued a notice of intent to revoke its 2012 approval of Chaparro Navarro's petition for U nonimmigrant status on the ground that "the approval was in error." CNAR 353-55. In its notice, USCIS stated that the evidence submitted with Chaparro Navarro's petition did not establish that she was a victim of felonious assault. CNAR 354. Chaparro submitted a response on October 17, 2014 in which she argued that robbery under California law is a felonious assault and thus she was a victim of a qualifying crime under 8 C.F.R. § 214.14(a)(9). She also submitted additional evidence and briefing in support of her response. CNAR 358-408. On October 7, 2015, USCIS notified Chaparro Navarro that her

---

[2] The administrative record filed at Docket No. 68-1 is actually two records filed together—one pertaining to Chaparro Navarro and one pertaining to Morales. Chaparro Navarro's record is filed at Docket No. 68-1, ECF pp. 1-416. Morales's record is filed at Docket No. 68-1, ECF pp. 417-522.

petition was revoked because "what happened to [Chaparro Navarro] is not substantially similar to felonious assault." CNAR 287-88. USCIS also denied Morales's derivative petition. MAR 7-8.

In November 2015, Chaparro Navarro appealed the revocation to USCIS. CNAR 241-42. In her appeal, Chaparro Navarro argued that robbery and felony child endangerment are substantially similar to felonious assault. She also argued that USCIS lacks statutory authority to revoke an individual's U nonimmigrant status. CNAR 144-51.

The AAO dismissed her appeal in a decision issued on November 8, 2016, concluding that the revocation was proper because Chaparro Navarro was not the victim of qualifying criminal activity. It further concluded that "USCIS has the authority to revoke an approved petition for U nonimmigrant status under 8 C.F.R. § 214.14(h)." CNAR 135-42.

Chaparro Navarro filed this lawsuit on November 2, 2017. On September 6, 2018, USCIS notified Chaparro Navarro that it had reopened her appeal and gave her the opportunity to submit further evidence and arguments in support of her eligibility for U nonimmigrant status. CNAR 15-16. Chaparro Navarro submitted further evidence and arguments and the AAO issued a second decision on November 30, 2018, again finding that Chaparro Navarro was not the victim of qualifying criminal activity. CNAR 1-14, 17-38. The AAO also concluded that even if Chaparro Navarro "had established that she was the victim of a qualifying crime or criminal activity substantially similar to a qualifying crime, the record does not establish that she suffered substantial [physical or mental] abuse as a result" of the crime. CNAR 12. The November 30, 2018 AAO decision constitutes the final agency action in this case.

## III.    LEGAL STANDARDS

Plaintiffs challenge the AAO's November 30, 2018 decision under 5 U.S.C. § 706(2)(A) and (C).[3] These provisions state that a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of

---

[3] Plaintiffs make a passing reference to 5 U.S.C. § 706(2)(D), which provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (D) without observance of procedure required by law." *See* Pls.' Mot. 7. As Plaintiffs do not address this provision elsewhere in their motion, the court assumes that they are not raising an argument under this subsection.

discretion, or otherwise not in accordance with law; [or] . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . ."

### A.    Review Under 5 U.S.C. § 706(2)(A)

"Review under the arbitrary and capricious standard is deferential." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). In such cases, a district court's role is not fact-finding. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). A court should not vacate an agency's decision unless it has "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"To determine whether an agency violated the arbitrary and capricious standard, [the] court must determine whether the agency articulated a rational connection between the facts found and the choice made." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001). In order for the court to confirm the agency's decision as rationally connected to the facts, the agency must have considered "substantial evidence" that supported its decision. *See Nakamoto v. Ashcroft*, 363 F.3d 874, 881-82 (9th Cir. 2004) (applying substantial evidence standard in evaluating marriage fraud in immigration case). "To reverse under the substantial evidence standard, the evidence must be so compelling that no reasonable factfinder could fail to find the facts were as the [plaintiff] alleged." *Singh v. Reno*, 113 F.3d 1512, 1514 (9th Cir. 1997).

Turning to the last clause of section 706(2)(A), "[w]hen 'reviewing an agency's statutory interpretation under the APA's 'not in accordance with law' standard,' *see* 5 U.S.C. § 706(A)(2)," courts apply the two-step framework established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). *Nw. Envtl. Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1014

(9th Cir. 2008).  The *Chevron* two-step analysis focuses on Congressional intent:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 842-43 (footnotes omitted).  "Stated simply, if a statute is unambiguous, an agency's regulation must adhere to the statute's explicit intent.  If a statute is ambiguous, the court will defer to an agency's regulation implementing the statute if the agency's interpretation of the statute is reasonable." *Gonzales & Gonzales Bonds & Ins. Agency Inc. v. U.S. Dep't of Homeland Sec.*, 913 F. Supp. 2d 865, 874 (N.D. Cal. 2012) (citations omitted).  A permissible interpretation is "rational and consistent with [the statutory scheme]." *Local Joint Exec. Bd. of Las Vegas v. NLRB*, 657 F.3d 865, 870 (9th Cir. 2011) (citing *United Food & Commercial Workers Union v. NLRB*, 307 F.3d 760, 766 (9th Cir. 2002) (en banc)).

### B.     Review Under 5 U.S.C. § 706(2)(C)

Under 5 U.S.C. § 706(2)(C), a court must "set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  Under this provision, courts also apply the two-step *Chevron* test.  *Nw. Envtl. Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008).

## IV.    DISCUSSION

Plaintiffs advance two primary arguments.  First, they argue that Congress did not give USCIS the authority to revoke U nonimmigrant status.  Therefore, 8 C.F.R. § 214.14(h)(2), which purports to permit such revocation, is *ultra vires*.  *See City of Arlington, Texas v. FCC*, 569 U.S. 290, 297-98 (2013) (agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*.").  Accordingly, Plaintiffs assert that USCIS's revocation of Chaparro Navarro's U nonimmigrant status constituted agency action that was both "not in accordance with law" and "in excess of statutory jurisdiction [and] authority" under sections

7

706(2)(A) and (C).

Second, Plaintiffs argue that even if USCIS had authority to revoke Chaparro Navarro's status, the means by which it did so was arbitrary and capricious under section 706(2)(A). Plaintiffs do not challenge the merits of the revocation decision. [Docket No. 74 (Pls.' Opp'n) 1.]

In response, Defendants assert that USCIS has authority to revoke U nonimmigrant status and that its regulation regarding revocation is entitled to deference under *Chevron*. They further argue that USCIS properly revoked Chaparro Navarro's approved petition for U nonimmigrant status.

### A. Whether USCIS Has Authority to Revoke Chaparro Navarro's U Nonimmigrant Status

In revoking Chaparro Navarro's U nonimmigrant status, USCIS relied on 8 C.F.R. § 214.14(h)(2), which governs revocation on notice.[4]  The parties disagree about whether the regulation is authorized by statutory text.  They also dispute the degree of deference, if any, that it should be accorded.  Although Defendants appear to concede that no statute specifically addresses revocation of U visas, they argue that DHS enacted the revocation regulation at issue in accordance with two statutory provisions, 8 U.S.C. §§ 1184(a)(1) and 1103(a)(3).  *See* Defs.' Mot. 12.  They further argue that DHS's regulations are entitled to deference under *Chevron*.  Defs.' Mot. 12-17.  In response, Plaintiffs assert that *Chevron* deference does not apply here because DHS itself has recognized that its authority to enact a revocation regulation is implicit rather than explicit.  Pls.' Opp'n 8-9.

The Supreme Court explained that "*Chevron* deference . . . is not accorded merely because the statute is ambiguous and an administrative official is involved.  To begin with, the rule must be promulgated pursuant to authority Congress has delegated to the official."  *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006).  "Deference in accordance with *Chevron* . . . is warranted only 'when it

---

[4] 8 C.F.R. § 214.14(h) also includes a provision for automatic revocation of an approved petition for U nonimmigrant status.  *See* 8 C.F.R. § 214.14(h)(1) (providing that "[a]n approved petition for U-1 nonimmigrant status will be revoked automatically if . . . the beneficiary of the approved petition notifies the USCIS office that approved the petition that he or she will not apply for admission to the United States and, therefore, the petition will not be used.").  Plaintiffs do not challenge this provision.

appears that Congress delegated authority to the agency generally to make rules carrying the force

of law, and that the agency interpretation claiming deference was promulgated in the exercise of

that authority.'"  *Id*. at 255-56 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27

(2001)).

Therefore, the first question here is whether DHS promulgated the revocation regulation

pursuant to authority delegated to it by Congress.  "The starting point for this inquiry is, of course,

the language of the delegation provision itself."  *Id*. at 258.

DHS explained the basis for its implicit authority to promulgate the revocation regulation

as follows:

> Revocation authority flows from section 214(a)(1) of the INA, 8
> U.S.C. 1184(a)(1). This provision authorizes the Secretary of
> Homeland Security to prescribe, by regulation, the time and
> conditions of admission of any nonimmigrant. *Implicit in this
> authority is the authority to prescribe the conditions under which
> nonimmigrant status may be revoked.*

Department of Homeland Security; New Classification for Victims of Criminal Activity;

Eligibility for "U" Nonimmigrant Status, Interim Rule, 72 Fed. Reg. 53014-01, 53030 (Sept. 17,

2007) (emphasis added).  Defendants argue that DHS's explanation reflects "a straightforward

reading" of the language of 8 U.S.C. § 1184, which states in relevant part:

> The admission to the United States of any alien as a nonimmigrant
> shall be *for such time and under such conditions as the Attorney
> General may by regulations prescribe,* including when he deems
> necessary the giving of a bond with sufficient surety in such sum and
> containing such conditions as the Attorney General shall prescribe, to
> insure that at the expiration of such time or upon failure to maintain
> the status under which he was admitted, or to maintain any status
> subsequently acquired under section 1258 of this title, such alien will
> depart from the United States. . . .

8 U.S.C.A. § 1184(a)(1)[5] (emphasis added); Defs.' Mot. 15.  Defendants also cite 8 U.S.C. §

1103(a)(3) as further support for DHS's authority to issue the revocation regulation.  That statute

provides that the Secretary of Homeland Security "shall establish such regulations; prescribe such

---

[5] The parties agree that the statute's reference to the "Attorney General" should be interpreted as a
reference to the Secretary of Homeland Security.  *See* Pls.' Mot. 10 n.2; Defs.' Mot. 11 n.1 (citing
*Buddhi v. Holder*, 344 Fed. Appx. 280, 284 n.1 (7th Cir. 2009) (explaining that the Homeland
Security Act of 2002 transferred the responsibilities described in 8 U.S.C. § 1184(a)(1) to the
Secretary of Homeland Security)).

1    forms of bond, reports, entries, and other papers; issue such instructions; and perform such other

2    acts as he deems necessary for carrying out his authority under the provisions of this chapter." 8

3    U.S.C. § 1103(a)(3).

4           In response, Plaintiffs argue that the Ninth Circuit foreclosed DHS's ability to rely on a

5    statutory grant of implicit authority. They cite *Gorbach v. Reno*, 219 F.3d 1087, 1092-93 (9th Cir.

6    2000) (en banc), and *Nijjar v. Holder*, 689 F.3d 1077, 1084 (9th Cir. 2012).

7           In *Gorbach*, the Ninth Circuit considered "whether the power to confer citizenship through

8    the process of naturalization necessarily includes the power to revoke that citizenship"; it

9    concluded that it does not. 219 F.3d at 1089. *Gorbach* examined the language, structure and

10   history of the two statutes at issue. In 1990, Congress amended the Immigration and Nationality

11   Act to confer "sole authority to naturalize persons as citizens of the United States . . .

12   upon the Attorney General." *See id*. (citing 8 U.S.C. § 1421(a)). Prior to the amendment, new

13   citizens had been naturalized in court. *Gorbach*, 219 F.3d at 1089. A separate statute entitled

14   "Revocation of Naturalization," 8 U.S.C. § 1451, provides that "United States attorneys shall

15   institute actions to revoke naturalization, in appropriate circumstances, in United States District

16   Courts." *Id*. at 1090 (citing 8 U.S.C. § 1451(a)). Several years after the 1990 amendment, the

17   Attorney General issued regulations governing revocation of naturalization. The regulations

18   included a provision for administrative denaturalization by which, "'[o]n its own motion, the

19   [Immigration and Naturalization] Service may reopen a naturalization proceeding and revoke

20   naturalization' in various circumstances" which "overlap the circumstances for which the Attorney

21   General must bring actions in district court to revoke naturalizations." *Id*. at 1091 (quoting 8

22   C.F.R. § 340.1). A group of citizens who had been served with notices of intent to revoke their

23   naturalization sought to enjoin the Attorney General from proceeding under the new regulations.

24   The district court granted a preliminary injunction and the government appealed. *Id*. at 1091.

25          The Ninth Circuit began its analysis by invoking the principle that "[a]n agency may not

26   confer power upon itself." *Id*. at 1092-93 (quotation omitted). Therefore, it looked to "the

27   relevant statutes [for] some express or implied delegation of authority to the Attorney General to

28   revoke the citizenship of a naturalized American citizen." *Id*. at 1093. The court first addressed

10

the government's argument that the regulation was entitled to *Chevron* deference. Noting that "*Chevron* deference 'is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gap,'" the court found that the theory had no application "because the context [of the statute at issue] leaves no room to infer an implicit delegation, so there is no room for *Chevron* deference." *Id.* The court held that Congress had expressly delegated to the Attorney General the "authority to naturalize" citizens, but not the authority to denaturalize them. Indeed, section 1451 supports the opposite proposition, for it contains an express statutory procedure for denaturalization through which "United States attorneys are supposed to bring proceedings 'in any district court.'" *Id.* at 1093-94 (citations omitted). Accordingly, the statute was not "'silent' with respect to 'the specific issue' of denaturalization." *Id.* at 1093. "Read in context," the court explained, "the statute is unambiguous in *not* conferring upon the Attorney General the power to denaturalize citizens administratively." *Id.* (emphasis in original).

Ultimately, the *Gorbach* court concluded that Congress had "not 'explicitly left a gap for the agency to fill,' or made an 'implicit' delegation to an agency, which would require *Chevron* deference." *Id.* (quoting *Chevron*, 467 U.S. at 843-44). The court noted that "[t]he only statutory language from which the Attorney General infers a power to denaturalize is a saving clause which states: "[n]othing in this section shall be regarded as limiting, denying, or restricting the power of the Attorney General to correct, reopen, alter, modify, or vacate an order naturalizing the person." *Id.* at 1094 (quoting 8 U.S.C. § 1451(h)). The court rejected the Attorney General's reliance on that language, holding that "[a] saving clause does not create anything; it merely preserves from repeal what is already there . . . [u]nder the saving clause, what authority the Attorney General has, she keeps, but it does not give her more." *Id.* Observing that "[t]he heart of the Attorney General's argument is that the power to denaturalize is 'inherent' in the power to naturalize," the court held that "[t]here is no reason why that should be so. There is no principle that what one can do, one can undo." *Id.* at 1095. Instead, wrote the court, "[w]hether the Attorney General can undo what she has the power to do, naturalize citizens, depends on whether Congress said she could." *Id.*

11

Accordingly, the court held that "the new regulations for administrative denaturalization were promulgated without authority from Congress":

> Congress has provided one way to revoke the citizenship of a naturalized American citizen: that is for a United States Attorney to file a petition in a United States District Court. There is no statutory warrant for a second way, whereby the Immigration and Naturalization Service would revoke a person's citizenship administratively.

*Id*. at 1099.

Twelve years after its decision in *Gorbach*, the Ninth Circuit issued *Nijjar*, in which it considered whether DHS has authority to terminate a nonresident's asylum status. In 1996, the Immigration and Naturalization Service ("INS") granted asylum to Nijjar, who then brought his wife and child into the United States as derivative asylees. 689 F.3d at 1078. In 2003 the INS ceased to exist due to a restructuring of the immigration system, and most of its functions were transferred to DHS, which in turn charged its agency, USCIS, with administering asylum applications through its asylum officers. The Executive Office of Immigration Review ("EOIR") also continued to administer asylum applications through immigration judges. *Id*. at 1078-79. In late 2003, Nijjar was notified that the INS intended to terminate his asylum status for fraud, even though that agency no longer existed. In 2004, after Nijjar failed to appear for a termination interview, USCIS sent a notice informing him that it had terminated his asylum status. *Id*. at 1079. It then placed Nijjar and his family in removal proceedings. Nijjar moved to terminate the proceedings on the ground that USCIS lacked authority to terminate his asylum status, and that only the Attorney General has such authority. *Id*. at 1080.

The Ninth Circuit held that DHS lacked authority to terminate asylum status through USCIS. *Id*. at 1081. In so doing, it found that "Congress did not confer the authority to terminate asylum on [DHS]. Congress conferred that authority exclusively on the Department of Justice." *Id*. at 1082. 8 U.S.C. § 1158 provides that "the Secretary of Homeland Security **or** the Attorney General may **grant** asylum . . . ." *Id*. (emphasis in original) (citing 8 U.S.C. § 1158(b)(1)(A)). However, "[t]he 'termination of asylum' subsection of the statute says that asylum 'may be terminated if the Attorney General determines' that any of several conditions are met." *Id*.

12

(quoting 8 U.S.C. § 1158(c)(2)). The court held that *Chevron* deference thus was not applicable "because Congress did not confer discretion on [DHS] to issue regulations or interpret the statute insofar as it addresses termination of asylum." Instead, "Congress said that termination of asylum is within the authority of the 'Attorney General.'" *Id*. at 1083. Accordingly, as "Congress spoke directly to the precise question of who can terminate asylum," the court concluded that it could not apply *Chevron* deference. *Id*.

*Nijjar* also rejected the government's argument "that what [DHS] can grant it implicitly can take away," citing *Gorbach*. *Id*. at 1084. The court explained that "Congress conferred authority on both the Attorney General and [DHS] to give asylum, but only on the Attorney General to take it away." *Id*. *Nijjar* concluded that the regulations pursuant to which DHS terminated asylum status were *ultra vires*. *Id*. at 1085-86.

Here, Plaintiffs argue that *Gorbach* and *Nijjar* foreclose any reliance by Defendants on a purported statutory grant of implicit authority to promulgate the regulation at issue in this case. They argue that "[t]here is simply no room for the agency to claim 'implicit authority' when Congress has chosen not to provide express statutory authority." Pls.' Mot. 10.

At the hearing, Plaintiffs clarified and narrowed their position. They do not assert that an administrative agency cannot promulgate a regulation in the absence of express authority to do so. Such an argument would clearly contradict the holding in *Chevron* that "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, *implicitly or explicitly*, by Congress." *Chevron*, 467 U.S. at 843 (emphasis added). The Supreme Court recognized that "[s]ometimes the legislative delegation to an agency on a particular question is implicit rather than explicit." *Id*. at 844. The Ninth Circuit recognized this in *Gorbach*, beginning its analysis of the regulation at issue "by seeking in the relevant statutes some express *or implied* delegation of authority to the Attorney General to revoke the citizenship of a naturalized American citizen." *Gorbach*, 219 F.3d at 1093 (emphasis added).

Instead, at oral argument, Plaintiffs asserted that *Gorbach* and *Nijjar* rejected a "species" of implied authority. According to Plaintiffs, the Ninth Circuit has foreclosed DHS from asserting

13

that it had implicit authority to issue the revocation regulation based solely on its power to grant nonimmigrant status.

If that were the sole basis for DHS's authority, the court would agree with Plaintiffs on this point, for "[t]here is no general principle that what one can do, one can undo." *Gorbach*, 219 F.3d at 1095. However, the circumstances at issue here are distinguishable from those in *Gorbach* and *Nijjar*. This case does not involve issuance of regulations regarding revocation of a status where Congress conferred the authority to revoke that status on a different agency. Nor does DHS assert authority to issue the revocation regulation based solely on its congressionally delegated power to grant nonimmigrant status. Instead, DHS relies on specific statutory provisions in 8 U.S.C. §§ 1184 and 1103 as the sources of delegated authority to issue the revocation regulation. Accordingly, the court must examine those statutes to determine whether the revocation regulation is *ultra vires*.

"In determining whether an agency regulation is *ultra vires*, [courts] apply the two-step *Chevron* analysis." *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 525 (9th Cir. 2012) (citing *Mejia v. Gonzales*, 499 F.3d 991, 996 (9th Cir. 2007)). At the first step, the court must ask "whether Congress has directly spoken to the precise question at issue," that is, whether Congress conferred authority to revoke U nonimmigrant status on DHS or on any agency. *See id.* at 512 (quoting *Chevron*, 467 U.S. at 842). In their briefing, Defendants appeared to argue that Congress expressly granted DHS the authority to issue the revocation regulation. Defs.' Mot. 13-14. However, at oral argument, defense counsel conceded that the words "revoke" or "revocation" do not appear in 8 U.S.C. §§ 1184 and 1103.[6] The court concludes that Congress has not directly spoken to the question of whether DHS possesses authority to revoke U nonimmigrant status. Neither section 1184, entitled "Admission of nonimmigrants," nor section 1103, entitled "Powers and duties of the Secretary [of Homeland Security], the Under Secretary, and the Attorney General," addresses revocation of U nonimmigrant status. Similarly, 8 U.S.C. § 1101, which

---

[6] Defense counsel also failed to reconcile the purported existence of an express grant of authority with DHS's statement during rulemaking that it was relying on an *implicit* grant of authority to issue the regulation.

defines U and nonimmigrant statuses, does not address revocation of any nonimmigrant status.[7]

As Congress did not expressly confer authority on DHS to revoke U visas, the court proceeds to *Chevron* step two, which requires the court to "assess 'whether the agency's [regulation] is based on a permissible construction of the statute.'" *Mejia*, 499 F.3d at 996 (quoting *Chevron*, 467 U.S. at 843). "In making this determination, [the court] 'need not conclude that the agency construction was the only one it permissibly could have adopted . . . , or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.'" *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 492 (9th Cir. 2007) (quoting *Chevron*, 467 U.S. at 843 n.11). "Rather, 'Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.'" *Id.* (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (quotation omitted)).

In arguing that the revocation regulation is based on a permissible statutory construction that is entitled to *Chevron* deference, Defendants rely on the language italicized below in 8 U.S.C. § 1184:

> *The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary of Homeland Security] may by regulations prescribe*, including when he deems necessary the giving of a bond with sufficient surety in such sum and containing such conditions as the Attorney General shall prescribe, to insure that at the expiration of such time or upon failure to maintain the status under which he was admitted, or to maintain any status subsequently acquired under section 1258 of this title, such alien will depart from the United States. . . .

8 U.S.C. § 1184(a)(1) (emphasis added). In addition, Defendants point to 8 U.S.C. § 1103(a)(3),

---

[7] The only reference to revocation in these statutes is in 8 U.S.C. § 1184(g)(3), which does not apply here. It addresses visas issued under 8 U.S.C. § 1101(a)(15)(H)(i)(b) to noncitizens "coming temporarily to the United States to perform" certain services. Section 1184(g) sets forth the total number of noncitizens per fiscal year who may be provided nonimmigrant status under that provision of section 1101, and states that if an individual who was granted such status "is found to have been issued such visa . . . by fraud or willfully misrepresenting a material fact and such visa or nonimmigrant status is revoked, then one number shall be restored to the total number of" noncitizens who may be issued visa in the fiscal year in which the petition is revoked. 8 U.S.C. § 1184(g)(3).

which provides that the Secretary of Homeland Security "*shall establish such regulations*; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts *as he deems necessary for carrying out his authority under the provisions of this chapter.*" 8 U.S.C. § 1103(a)(3) (emphasis added).

Read together, sections 1184(a)(1) and 1103(a)(3) reasonably can be interpreted as authorizing the issuance of regulations that address the conditions of admission to the United States as a nonimmigrant, as well as the length of time of admission. From there, the court must specifically determine whether the regulation setting forth a procedure for *revoking* approved petitions for U nonimmigrant status "is based on a permissible construction of the statute[s]" and is entitled to deference. *See Chevron*, 467 U.S. at 843. The court concludes that it is. Section 1184(a)(1) confers authority on the Secretary of Homeland Security to promulgate regulations governing the time and conditions of nonimmigrant admissions, and section 1103(a)(3) authorizes the Secretary to establish regulations "necessary for carrying out his authority." The phrase "for such time" in section 1184(a)(1) can reasonably be interpreted to mean that DHS has authority to limit the amount of time during which a noncitizen may be admitted as a nonimmigrant. The statute further provides that DHS may set "conditions" for admission as a nonimmigrant. The requirement of maintaining eligibility for U nonimmigrant status reasonably can be construed as one such condition. The court therefore concludes that a regulation addressing revocation of U nonimmigrant status that is promulgated pursuant to the agency's statutory authority to address the time and conditions under which a noncitizen is admitted is not "arbitrary, capricious, or manifestly contrary to the statute[s]." *See Ruiz-Diaz v. United States*, 618 F.3d 1055, 1060 (9th Cir. 2010) ("When, as here, Congress has expressly conferred authority on the agency to implement a statute by regulation, the regulations have 'controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" (quoting *Chevron*, 467 U.S. at 843-44)). Accordingly, 8 C.F.R. § 214.14(h)(2) is entitled to *Chevron* deference and is not *ultra vires* to the governing statutes, 8 U.S.C. §§ 1184(a)(1) and 1103(a)(3). *See United States v. Dang*, 488 F.3d 1135, 1141 (9th Cir. 2007) (holding that DHS's regulation was "not beyond the agency's statutory mandate[,] . . . is entitled to *Chevron* deference and, therefore, is not *ultra vires* to the

governing statute").

**B.      Whether the Means by Which USCIS Revoked Chaparro Navarro's Status was Arbitrary and Capricious**

Plaintiffs raise three bases for their argument that USCIS acted arbitrarily and capriciously in revoking Chaparro Navarro's U nonimmigrant status. First, they challenge the legality of the agency's unexplained decision to revisit its grant of nonimmigrant status. Next, they argue that the revocation based on the lack of qualifying criminal activity cannot stand. Finally, they contend that the agency violated its own regulations by basing its final decision on a ground not originally stated in the notice of intent to revoke.

Under the APA, a court may "hold unlawful and set aside [an] agency action" if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 50 (1983). "Federal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2706 (2015) (quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.'" *Id.* (quoting *Allentown*, 522 U.S. at 374). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quotation omitted). "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan*, 135 S. Ct. at 2706 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

**1.      USCIS's Decision to Reexamine Chaparro Navarro's Status**

In its September 16, 2014 notice of intent to revoke, USCIS stated that "[o]n October 1, 2012, your petition was approved. It has now come to the attention of USCIS that the approval was in error." CNAR 353. USCIS cited the revocation regulation, which provides that an approved petition for U nonimmigrant status can be revoked where "approval was in error," 8 C.F.R. § 214.14(h)(2)(i)(B), then stated that "the supporting evidence does not show you are a

victim of felonious assault[.]"  CNAR 354.  Both the November 8, 2016 and November 30, 2018 AAO decisions denying Chaparro Navarro's appeal set forth this same reason.  The later AAO decision added the justification that Chaparro Navarro did not suffer "substantial [physical or mental] abuse as a result of the crime.  *See* CNAR 1-14, 135-42.

Plaintiffs do not challenge the merits of the agency's decision.  Instead, they question USCIS's right to revisit its grant of nonimmigrant status to Chaparro Navarro.  According to Plaintiffs, "[i]t is surely arbitrary and capricious as a matter of process to reopen a long-ago decided matter without providing a reason for initially deciding to revisit the approval."  Pls.' Mot. 14.

Defendants respond that "[t]here is no requirement, and Plaintiffs point to none, that the agency must provide an explanation as to how or why it became aware of its prior errors."  Defs.' Mot. 19.

The parties did not brief this issue in any detail.  Therefore, the court ordered them to submit supplemental briefing "addressing USCIS's power to reexamine Chaparro Navarro's petition for U nonimmigrant status after nearly two years and without providing a reason for reexamination."  In particular, the court directed the parties to discuss Judge Thomas's statement in his concurring opinion in *Gorbach* that "[e]very tribunal, judicial or administrative, has some power to correct its own errors or otherwise appropriately to modify its judgment, decree, or error," and that "[i]n the administrative context, this right is generally limited to 'a short period after the making of the decision and before an appeal has been taken or other rights vested."  Minute Order (citing *Gorbach*, 219 F.3d at 1102 (Thomas, J. concurring)).  The parties timely filed the requested briefing.  [Docket Nos. 79 (Defs.' Supp. Br.), 80 (Pls.' Supp. Br.), 81 (Defs.' Supp. Reply), 82 (Pls.' Supp. Reply).]

In their supplemental briefing, Defendants argue for the first time that "[a]s a general matter, an agency has the inherent power to correct errors," citing Judge Thomas's concurring opinion in *Gorbach* and two D.C. Circuit cases holding that "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion."  Defs.' Supp. Br. 2 (citing *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86

18

(D.C. Cir. 2014) and *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950)).  According to Defendants, the power to correct "is especially clear in cases of legal error," and USCIS acted reasonably in considering revocation during the period that Chaparro Navarro had been granted U nonimmigrant status.  *Id*. at 4-5.

As an initial matter, Defendants' original briefing does not assert that USCIS revisited Chaparro Navarro's status pursuant to its inherent authority to correct errors.  Defendants inappropriately use the opportunity of supplemental briefing to raise new arguments that could and should have been raised in their original papers.  Defendants may not do so; their new argument is rejected on that basis.

In any event, the Ninth Circuit has never expressly held that agencies have the inherent power to reconsider their own decisions.  There is tension between such a principle and the majority opinion in *Gorbach*, in which the court held that "[a]n agency may not confer power upon itself."  *See Gorbach*, 219 F.3d at 1092-93, 1095 ("There is no general principle that what one can do, one can undo.").  Defendants acknowledge this tension but do not attempt to harmonize their position with *Gorbach*.  Instead, they simply assert that the facts of *Gorbach* are different from those in this case.  Defs.' Supp. Br. 1 n.1.[8]

Even assuming USCIS has the inherent authority to reconsider its decisions, such authority would not be without limit.  Courts that have held that administrative agencies possess the inherent authority to reconsider their decisions have also held that "an agency may undertake such reconsideration only if it does so within a reasonable time period and affords the claimant proper notice of its intent to reconsider the decision."  *Dun & Bradstreet v. U.S. Postal Serv*., 946 F.2d 189, 193 (2d Cir. 1991) (citing *Bookman v. United States*, 453 F.2d 1263, 1265 (Ct. Cl. 1972)); *Macktal v. Chao*, 286 F.3d 822, 826 (5th Cir. 2002).  "This policy balances the desirability of finality against the general public interest in attaining the correct result in administrative cases." *Dun & Bradstreet*, 946 F.2d at 193-94.  "What is a short and reasonable period will vary with each

---

[8] Plaintiffs argue that the government waived the inherent authority argument by failing to raise it in their cross-motion or opposition to Plaintiffs' motion.  They also assert that the principle of inherent authority is irreconcilable with *Gorbach*.  Pls.' Supp. Reply 2.

1    case, but absent unusual circumstances, the time period would be measured in weeks, not years."

2    *Cabo Distributing Co., Inc. v. Brady*, 821 F. Supp. 601, 612 (N.D. Cal. 1992) (quoting *Gratehouse*

3    *v. United States*, 512 F.2d 1104, 298 (Ct. Cl. 1975)).  In *Cabo Distributing*, the court held that the

4    Bureau of Alcohol, Tobacco and Firearms lacked implicit authority to revoke a certificate of label

5    approval three years after its initial approval, noting the "absence of any showing of 'unusual

6    circumstances.'"  821 F. Supp. at 613 (citing *Bookman*, 453 F.2d at 1265, and *Gratehouse*, 512

7    F.2d at 298).

8          Additionally, the reasonableness of an agency's decision to correct an alleged error "must

9    be judged in light of the time that has elapsed and the resulting reliance interests at stake."

10   *Solenex, LLC v. Jewell*, 334 F. Supp. 3d 174, 182 (D.D.C. 2018) (holding agency's decision to

11   cancel oil and gas lease over 30 years after granting it based on purported error was "arbitrary and

12   capricious" agency action, as was agency's failure to consider the plaintiff's reliance interests),

13   *appeal filed*, Nov. 28, 2018 (Nos. 18-5343, 18-5345).  *See also Prieto v. United States*, 655 F.

14   Supp. 1187, 1191-92 (D.D.C. 1987) (holding that agency's decision to rescind land's trust status

15   nine months after initial decision violated the APA and noting plaintiff's actions in reliance on the

16   initial grant of trust status).  The reason for reconsidering an earlier decision also bears on the

17   reasonableness of the agency's reconsideration; in *Solenex*, the court held that "[a]n unreasonable

18   amount of time to *correct* an alleged agency error, especially where the record shows that error

19   was readily discoverable from the beginning, violates the APA."  *Id.* at 182 (emphasis in original).

20         Here, USCIS granted Chaparro Navarro's petition for U nonimmigrant status on October

21   1, 2012.  Almost two years later on September 16, 2014, USCIS issued its notice of intent to

22   revoke her status, stating only that "the approval was in error."  CNAR 353-55.  While Defendants

23   acknowledge that reconsideration of an agency's decision "should take place within a reasonable

24   amount of time following the initial decision," Defs.' Supp. Br. 4, they do not identify the

25   existence of any "unusual circumstances" that would justify a nearly two-year delay in notifying

26   Chaparro Navarro of its intent to revoke her status based on error.  They also make no attempt to

27   argue that the error was not readily discoverable.  In fact, Defendants are notably silent as to why

28   USCIS decided to revisit its initial grant of U nonimmigrant status to Chaparro Navarro.  In sum,

Defendants offer no reason or argument for waiting two years before deciding to revoke the original grant of status. Instead, they make the sweeping assertion that USCIS should be permitted to revoke a petition for error at any point during the entire four-year period of U nonimmigrant status, regardless of the reason for revocation. Defs.' Supp. Br. 5.

Defendants' position is untenable, as it ignores both "the desirability of finality in an agency's decision," *Cabo Distributing*, 821 F. Supp. at 612 (quotation omitted), and the reliance interests at issue when U nonimmigrant status is granted. *See Solenex*, 334 F. Supp. 3d at 183-84 ("this 'wait and see' approach—though convenient from a policy perspective—wreaks havoc on the interests of individual leaseholders."). The reliance interests in this case are particularly heightened, since an individual with U nonimmigrant status may seek and obtain lawful permanent resident status after three years of continuous physical presence in the United States. *See* 8 U.S.C. § 1255(m)(1). As Plaintiffs point out, under Defendants' theory, "no U nonimmigrant could ever rest easy because at any time her status could be changed." Pls.' Supp. Reply 3. In sum, the court concludes that USCIS's revocation of Chaparro Navarro's status nearly two years after granting it due to an alleged error constituted "arbitrary and capricious" agency action. Because the court finds that USCIS violated the APA on this ground, it need not reach Plaintiffs' remaining arguments.

### C. Whether USCIS is Required to Consider Morales's Derivative Petition

Finally, Plaintiffs assert that because USCIS should not have revoked Chaparro Navarro's U nonimmigrant status, it must consider her father's derivative petition. They ask for mandamus relief under 28 U.S.C. § 1361 in the form of an order directing USCIS to adjudicate Morales's petition.

28 U.S.C. § 1361 is the federal mandamus statute. It provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Mandamus relief is an extraordinary remedy. It is "only available to compel an officer of the United States to perform a duty if (1) the plaintiff's claim is clear and certain; (2) the duty of the officer 'is ministerial and so plainly prescribed as to be free from doubt'; and (3) no other

adequate remedy is available." *Fallini v. Hodel*, 783 F.2d 1343, 1345 (9th Cir. 1986) (internal citations and quotations omitted).

In opposition, Defendants argue that Plaintiffs cannot meet the first two requirements for mandamus relief because USCIS had authority to revoke Chaparro Navarro's U nonimmigrant status and the decision "was amply supported by the administrative record and sound reasoning." Defs.' Opp'n 22. In other words, Defendants oppose Plaintiffs' request for mandamus relief on the ground that the revocation of Chaparro Navarro's status was proper. They offer no other argument. As discussed above, the court concludes that the revocation of Chaparro Navarro's U nonimmigrant status constituted "arbitrary and capricious" agency action. Accordingly, Plaintiffs are entitled to the relief they seek; that is, an order directing USCIS to consider Morales's derivative petition for U nonimmigrant status.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion is granted in part and denied in part. The parties shall immediately meet and confer regarding a proposed judgment and shall submit a stipulated proposed judgment within 14 days of the date of this order.

**IT IS SO ORDERED.**

Dated: April 1, 2020



Donna M. Ryu
United States Magistrate Judge